It's the appellant ready to proceed, or the appellee? Yes, sir. All right. You may proceed. Good morning. Your Honors, may it please the Court, Andrew Love for the Appellant Alaska Electrical Pension Fund. Falsity with regard to Hanger's financial statements is not in dispute. By having to restate financial results for five and a half years, Hanger admitted that those financial statements were false when made. The issue here, the one that is the basis for the District Court's dismissal, is C-ENTER. And whether defendants were aware or were at least severely reckless in not knowing that the statements were false. The complaint alleges a range of factors in support of a strong inference of C-ENTER, but I would like to focus on just one, if I may, which is the Audit Committee report. The others include that this was a five and a half year restatement, the magnitude of the accounting errors, the importance of the accounts involved, the pervasiveness of material weaknesses in the company's control environment. But I believe the report of the Audit Committee that Hanger itself commissioned to look into the circumstances surrounding the financial activities that led to the restatement provides the clearest answer. And so, if I could ask the Court to turn to the report itself, which is at tab five of the excerpts of record. And I'd like to point to two findings in the report that demonstrate that Hanger's improper accounting practices were done with the intention of falsifying their financial results. So at page four of the Audit Committee report, near the top of the page where it says quarter end adjustments to management estimates and certain accruals, the second paragraph. So these are adjustments to particular estimates which the Committee found that the specific amount appears to have been determined by former management without timely or appropriate analysis. In some cases, former management recorded adjustments to estimates before the analyses relating to those estimates had been completed. In other cases, after seeing the impact of particular assumptions or analyses relating to estimates, former management appears to have modified those assumptions or analyses in a manner which allowed the company to counteract or mitigate what otherwise would have been an adverse impact on the company's reported financial results. And then two paragraphs down, it concludes with regard to these practices, in the middle of that paragraph, particular adjustments to particular management estimates were undertaken for the purpose of enhancing the company's reported financial results. And it says that this is more likely than not that they're finding. And the second finding in the preceding paragraph, which discusses the creation of what the Committee refers to as a contingency reserve, and it says the contingency reserve, which was accrued and released inconsistent with GAAP in order to meet financial targets, and then again at the bottom of the next paragraph, it says that this accrual and release of the contingency reserve were not undertaken for the purpose of inappropriately enhancing the company's reported financial results. So these and other findings are not describing mismanagement, but intentional acts to falsify the results. And importantly, the report specifies and identifies Defendant McHenry, who was the former CFO, as having personally engaged in these improper accounting practices. At page two of the report, under the Executive Summary of Results, it notes more likely than not that certain former employees and officers, including in some instances the former Chief Financial Officer, and there's no dispute that that's McHenry, engaged in inappropriate historical accounting practices related to management estimates and certain accruals, as discussed below in the specific findings. The specific findings on the next page uses the exact same language and talks about the accounting practices relating to management estimates and certain accruals, which were the findings that I just discussed earlier. So it's clearly in the report below, and it's referring to former management engaging in these practices. It's a specific reference to Defendant McHenry. In addition, the Audit Committee not only found that former CEO Defendant Kirk and the former CFO McHenry, and the former Chief Accounting Officer as well, set an inappropriate tone at the top that emphasized achieving certain financial targets, and the Committee linked this tone to the particular financial accounting practices engaged in by Defendant McHenry. Now, the cases cited in the briefs about inappropriate tone are divided between, they distinguish between cases where an inappropriate tone is set at the top by management unwittingly, whether it's through incompetence or mismanagement, and that they're not aware of the accounting decisions that are done because of this tone setting. And then there are the cases like this one where there's a link between the inappropriate tone at the top and the accounting practices, and here the link is clearly McHenry. He set the inappropriate tone, or it was one of the people who set the inappropriate tone, and then he engaged in these very accounting practices. What do you contend that means, set the tone at the top? What does that mean? That means that they were, well, as the report says, they were emphasizing that certain financial targets needed to be met, and in the context of this report. And what's wrong with that? In the abstract setting, financial targets, there's nothing wrong with that, but in the context of this report, what that meant was, regardless of the reality of the company's financial status, that they needed to manipulate numbers in order to. But there's a difference between saying, these are targets that we want to hit, and saying, whether or not we hit them, just prepare reports that make it look like we hit them. Correct. It's two different things. Right. And then when you look at the report, it's clear that what McHenry was doing, and it was based on this, well, it's called an inappropriate tone, so it's not a harmless tone, to set these targets was to manipulate various estimates with regard to accounts receivable, with regard to inventory, this contingency reserve, and manipulate the numbers in order to hit those targets. And that's exactly what they did. That's what the audit committee found that they did, and they did it because of this tone at the top. Particularly with regard to McHenry, whether the tone was harmless or not, he was signing financial statements on behalf of the company, knowing that he had manipulated these numbers. And clearly, when you look at the five-and-a-half years of restatement, it's a $95 million overstatement where income was overstated every quarter for five-and-a-half years. With this inappropriate tone at the top, and with the committee finding that the chief financial officer, chief accounting officer engaged in these very practices, the inference, the plausible inference of intentionally creating these results is at least as equal to the And that's, for Sienter, the plaintiffs get the benefit of the tie. What do you make of the fact, as I understand it, that Mr. Asar and Kirk increased their stock holdings during the class period? First of all, do I understand that correctly, that they? I believe that's true. What is that? What do you make of that? You know, the fact that they, I think these are, I don't think we necessarily rely as far as Asar and Kirk in terms of proving Sienter. There may be innocent reasons why they sold stock and bought stock. It's perhaps more of a fact question. And with McHenry, though, he did sell. Doesn't it suggest that they weren't intending? It's not a very good scheme to defraud if you're investing. You know, it's unclear why they would have. They also, they sold more stock during the class period than they did in previous periods. I think the stock sales is a, it's a bit of a fact-laden question. And again, going back to McHenry, McHenry sold 80 percent of his stock during a three-year period of the class period. So it's, whether it may be less culpable for Kirk and Asar, certainly, again, McHenry is culpable. So again, McHenry was not only involved in setting the tone, but he was found to have engaged in the appropriate practices himself. Then there's Kirk, who set the tone with McHenry and with the CAO to achieve these financial results, which supports the inference that he knew what the other two were doing. They set the tone themselves, and then the officers were involved and actually engaged in the financial accounting practices, manipulated these results. And then there's Asar, who first he was, he was president when the tone was set, but then he became the CEO. He certainly was president when this tone was set, and even though there, the committee was clear to say there was no specific conduct with regard to Asar, inappropriate specific conduct as opposed, again, to McHenry. He was there, and certainly it's a red flag if you're the president or the CEO and you're aware of this push towards manipulating financial targets, and between that, the magnitude of the fraud, the pervasiveness of, there were 11 material weaknesses during the class period that the company eventually admitted to, and delays in filing of SEC documents. The accounting procedures in the company were a mess, and for these officers to be signing off on financial statements, on SEC filings, on the SOX certifications, which certified that the material weaknesses, that the controls, the environmental controls of the company to ensure the reliability of the statements, and they were just signing off on these every quarter and overstating income every quarter, there's, again, it's at least plausible, and just as plausible that they knew what was going on compared to that this was just mismanagement. Well, but you described it as a mess. Yes. Isn't that what you called it? So wouldn't that suggest that there wasn't any scheme, that it was just a big mess? Well, I think the audit committee report, again, if you look at that, there is a scheme. They were, and I just read a couple of examples, but they were intentionally manipulating numbers in order to enhance financial results, and with the contingency reserve, they would wait until the end of the month to see where the targets were, and then move this money around. They were manipulating inventory for the same reasons, and they were doing this in order to, as the report says, again, enhance the results. So this is, so I think there was both going on. There was this scheme to manipulate the numbers, and then there's this sort of mess of accounting which allowed them to engage in this scheme. How much of a problem is it that there's a lot of passive voice in the audit committee report? I mean, we know that Congress has passed this law requiring a great deal of specificity, and we can debate whether that's a good law or not, but the point is Congress is clearly favoring SEC enforcement over private enforcement. What do you make of the fact that there's not a whole lot of individuation in the report? Well, there are a couple of places where they use the passive voice. Again, I think if you look at the report in total, it's at least equally plausible that this is a financial scheme, as the writer said, as opposed to mismanagement. And there are several places where, even when the committee says something like, well, the evidence of what the purpose was was either direct or conclusive, it was more likely than not that they were undertaking these practices for the purpose of inappropriately enhancing the company's reported financial results. And so, again, it's certainly an inference that this was intentional. It's at least as plausible as the other sides. But your position that if any one or more of the individual defendants have committed what you've accused them of, that that automatically makes the company responsible as well? That's exactly right. That the actions of a corporate officer is imputed to the company. And we have, certainly we have McHenry, who's specifically named in the audit report as being involved in setting the tone and then taking that to the next step and engaging in these financial improper practices himself. So, that's my time for rebuttal, unless there are further questions. Thank you, Counsel. This is Mr. Is it Bessette? It's Bessette, Your Honor. May it please the Court. Good morning. Paul Bessette of King & Spaulding. For defendants Hanger and Mr. Asar, the current Chief Executive Officer, counsel for Mr. McHenry and Mr. Kirker here separately, I will address some of the arguments because, as Your Honor indicated, the company would be on the hook for any of the three if they have liability going forward. We submit that Judge Sparks got it right. This Court should affirm dismissal and, as you know, reading the opinion, he had one paragraph on the audit committee report and counsel and opposition spent the whole time about the audit committee report and invited the Court to look at that report. I do the same because what he didn't explain is some other things in the report. The entire report by the audit committee is in the subject of, as counsel indicated, quarter end adjustments and estimates and accruals. This is a subject which the report itself indicated offers wide latitude for management judgment. So what is indicated in the report is that management, meaning Mr. McHenry and, to whatever extent Mr. Kirker on the tone at the top, were dealing with estimates and accruals which offered them wide latitude of judgment and they had a target of trying to hit numbers. But there is nothing in the report and nothing in the complaint that indicates any red flags or any knowledge that any of these people were violating GAAP or doing anything intentionally wrong other than operating in an area that afforded them judgment and they were making their judgments with a target of meeting or exceeding numbers, which in hindsight the audit committee decided that was inappropriate. But there's nothing in the report and nothing in the complaint that says they knew at the time that what they were doing was wrong or was severely reckless or intentionally misleading. There's nothing in there. There's nothing that they were hiding numbers from auditors or doing anything that was intentionally wrong or severely reckless. And that's really the problem here is because plaintiffs are taking this audit committee summary report and saying this shows C enter and because they used the phrase tone at the top that they try to equate that to a culture of fraud for the entire five and a half year class period without, as Judge Sparks noted, tying any particular, which they were required to do, by the way, under the PSLRA and the circuit's authority, is to tie each false misleading statement to a speaker who made that statement with C enter. They haven't done that. All they've said is look at this audit committee report. It uses tone at the top. It uses inappropriate accounting entries. That must be enough for C enter and it's not under the law. It should have been a jumping off point for plaintiffs to do their own investigation to plead a proper claim. That's essentially what Judge Sparks was saying. I gave you a roadmap. The last time I dismissed the case. Now you've come here and used this audit committee summary report and you haven't tied anything to any of the false or misleading statements to any particular group with the adequate C enter. And that's the problem. If they're going to use the audit committee summary report, they're going to live and die by it. And Mr. Assar was completely exonerated in the report on tone at the top. He shouldn't be in this case. The selling is he doubled the number of shares he held in the class period. There's nothing in the report about him other than exonerating him. So I'd like to move past that and maybe go to what your Honor's question was. What is tone at the top? What does that mean? It is derived from COSA or it's an accounting framework for internal control for financial reporting. It is a term that is used for control environment. And what they were saying, well what they're not saying, when you say inappropriate tone at the top is not intentional misconduct. It could be no misconduct at all. It could be misjudgments, it could be aggressiveness, it could be negligence, but sometimes it could be misconduct. But there's nothing in the report here that indicates it's anything other than mismanagement. Because the subject matter, we're not talking about particular accounts that are hard numbers that don't, under GAAP, don't allow for management judgment. All of these areas allow for management judgment. And in hindsight, the Audit Committee decided that, and even though they admitted, the evidence was not conclusive or direct, and none of the witnesses said that this is what they were doing. But the Audit Committee said, in our view, in hindsight, it's more likely than not, that they exercised their judgment in a way that we view as inappropriate, in hindsight. Plaintiffs, to use that as a securities fraud basis, just doesn't meet the test. They should have done their own investigation, found confidential witnesses, or whatever they do, to plead a proper claim. The only issue in the Audit Committee summary report that shows anything about intentional fraud is that an employee who actually fabricated records, and when the Audit Committee found intentional fraud, they called it out. So if plaintiffs want to plead a claim against him, they would have to show that he made a statement about the issue of the records he falsified. That would meet the test for a securities fraud case, not what they currently plead. And that's the reason not only Mr. Assar, but Mr. McHenry and Mr. Kirk should be dismissed or the firm of the dismissal, because plaintiffs just haven't pled sufficient factual basis for any of them by relying on the Audit Committee summary report. Again, I would point the Court to look at the Audit Committee summary report just like plaintiffs' counsel did. And just like Judge Sparks looked at it and said, this is nothing but group pleading, because it is a, whatever verb you want to use, but it's a mosh of, you know, we have, in hindsight, we have looked at some of this. We think this was inappropriate management judgment. So how does a plaintiff supposed to nudge that beyond management judgment or misjudgment to intentional fraud? Well, they have to do their own homework, and they haven't done that here. So, Your Honor, I'd like to, if there are no questions, cede the balance of my time to Counsel for McHenry and Kirk to go into more detail. All right. Thank you, Counsel. Mr. Stokes. Thank you, Your Honor. Your Honor, if it may please the Court, Peter Stokes and Norton Rose Fulbright on behalf of the appellee, George McHenry. As Judge Ho indicated in a prior question, this really comes down to the statute that Congress wrote, which calls for particularized facts. And the statements that Mr. Love read into the record a few minutes ago are not particularized facts. They are conclusions. Congress knows the difference between facts and conclusions, and they made a legislative judgment to require facts. And this Court has enforced that over the past 20 years. In the Southland Securities case, on page 383, there is a vivid description of bad tone at the top. There's a much more particularized description in that case of a CEO berating a CFO, throwing numbers back in his face because they didn't appeal to the CEO, and telling people to backdate contracts to inflate revenues. And this Court held in Southland that that did not suffice to support a strong inference of Sienter because it was not linked to specific misstatements. It didn't show specific actions at specific times before specific statements. And this Court again and again and again has given effect to the plain language that Congress wrote by requiring that kind of specificity. And the plaintiffs in this case, by outsourcing their investigation to this Audit Committee report, have not met the statutory requirements that Congress imposed. And you're representing Mr. McHenry, right? I am, Your Honor. Are they correct that Mr. McHenry sold 80% of his stock during the class period? He sold about 80% of his stock over a four-year-plus class period. And the case law recognizes that, number one, there's nothing inherently wrong or suspicious about an executive selling stock. Number two, the fact that it's over a lengthy class period weighs against any strong inference of Sienter from those types of sales. Number three, the plaintiffs have not disputed with particularized facts that Mr. McHenry voluntarily retired at the end of 2014. And courts have recognized that sales by executives approaching retirement are fully expected and natural. It's a natural thing to expect as an executive winds down their career. How much of that 80% occurred before his retirement? This was all during the class period, Your Honor? It was all before retirement. It was, yeah, I believe it was, Your Honor. I could be, it's all in the record, it's attached with the form fours to the declaration. But it was over the full four-year class period. And this also just doesn't resemble the type of pump-and-dump case where a stock sale by executives could potentially enhance an inference of fraud. There's no allegation that there was some acute fact that wasn't disclosed by the company and you had executives dumping large amounts of stock right before that fact was about to come out. This case just doesn't fit that paradigm at all. This is a slow-burning restatement that wasn't announced until years later. And it just doesn't fit that sort of acute pump-and-dump type of fact pattern that courts usually insist on in finding a strong inference of scienter from executive sales. So you look at the stock sales holistically with everything else, and the mere fact that executives sell stock, even in large amounts, over a lengthy period of time, it just does not support what Congress, what the Supreme Court has required is a cogent and compelling inference of scienter. As the Court held in the Central Laborers case where they were... You recognize your time has expired. I'm sorry. I apologize, Your Honor. Why don't you use a little, a couple of minutes, and complete this thought that's important to the case. Thank you, Your Honor. I appreciate that. In the Central Laborers case, there was an allegation about stock sales coinciding with retirement, and the Court held in that case that even crediting the allegations, it didn't contribute anything significant to a strong inference of scienter. We would submit the Court here should draw the same inference. There were 10b-5-1 plans involved that were part of the record. The record also indicates that many of these stock sales were to settle taxes that accrue when you sell, you reach the end of an option period, you've got to pay taxes. So there are plentiful, innocent explanations, and the Court under Taleb's must consider plausible, non-culpable inferences, and those inferences in this case overwhelm any inference of scienter. Any other questions? All right. Thank you, Counsel. Thank you, Your Honor. It's on a pre-empted year. A pre-empted year. You may proceed. Good morning, Your Honors. May it please the Court, Howard Schiffman on behalf of Thomas Kirk. With respect to much of what you've heard this morning, most of it is irrelevant and doesn't really involve Mr. Kirk. Mr. Kirk was CEO for a very brief period, less than a year, at the initial period of the class. He was not involved and wasn't even present during the vast majority, if not all, of the alleged misstatements, the Medicare issues, the Janus implementation, and even the falsification of documents. If you strip away the generic allegations, which are improper group pleading, there is really virtually nothing about Mr. Kirk. In fact, there are really only four allegations about Mr. Kirk, and those are, one, that he was a CEO and therefore he had knowledge about the information, two, that he signed the financial reports in the SOX filings, third, that he sold stock, and fourth, that he's identified in the 8K, the audit committee, as inappropriate under the top. As the first three, I think we can deal with them very quickly. This court has repeatedly held in independent electrical workers, in Abrams, that simply being the CEO doesn't create an inference that you know information is false, and they allege no such red flags that would establish that. Again, the same rule, again by this court, as to signing of the documents. Again, we have independent electrical workers, central laborers of this court, which again, simply alleging signing of documents doesn't create a cogent and compelling inference of scienter. Third, the stock sales, and Judge Holt already stole my thunder, it is not a very good scheme to buy more shares during the class period, which is clearly true, and this comes from the form fours, which the court clearly had the right to consider. That really brings you to really the only allegation that exists as to Mr. Kirk, and that allegation is he is, the audit committee says, and the plaintiffs allege in their complaint, that he was responsible for an inappropriate tone at the top. There is no case that stands for the proposition that an allegation of inappropriate tone at the top by itself is sufficient, and in the unreported decision in the, in New Jersey in Hanger, the court so held, the Fourth Circuit so held that in Matrix. Again, there is no allegation, I think it was interesting when plaintiffs read the report, plaintiffs were careful to make sure they never said that there were any allegations of particularized wrongdoing by Mr. Kirk. There are other people who are criticized in the report, but never Mr. Kirk. Both the Matrix decision and the decision in Hertz stand for the proposition that tone at the top alone is insufficient. In fact, if you read the cases which are cited by the plaintiffs, I think it clearly establishes why Mr. Kirk must be dismissed. In those two cases, Luna and in Comscore, yes, there is inappropriate tone at the top, but then there's significantly more, which leads to the compelling inference of Sienter. In both cases, the executive was fired after the announcement of the misstatement, and there's a fair inference. If you're fired, maybe you did something wrong. In Comscore, the executive sold 92% of their stock. Another executive sold 83% of their stock. In the other cases, they're both alleged to be micromanagers and involved in the very activity, which is an issue. That contrasts to Mr. Kirk, who stands much more in the shoes of the Hertz decision and Matrix, so that is clear. And in fact, in the case in Luna, which they rely on, if you actually, to prove my point, two of the defendants, the CFOs, in which there are not those additional allegations of being fired and of selling stock, the court actually finds that there is, that that is insufficient. If there are no questions, thank you, Your Honor, for your time. Thank you, Your Honor. Roboto? Both sides are encouraging the court to look at the audit committee report, which I heartily recommend, both the June 2016 audit report, which is the one we've been talking about, and then the earlier one, February 2016, which is at tab six of the excerpts. And looking at these audit reports, there's nothing in here, as Counselor Ferrappelli said, about hindsight. That word does not appear in here. This isn't about hindsight. It's about what was going on at the time that the McHenry, the CAO, the company was manipulating these numbers. When Counselor talks about the language about that these analyses were estimates that provide wide latitude for management judgments, that sentence appears just before the paragraph that I, the first paragraph I read, to Your Honors. It's in the context of inappropriate financial accounting activities that were more likely than not enhancing the company's reports. What the committee is, in context, is saying there is, yes, there is wide latitude for management judgment, and that's what allowed them to get away with it, that there weren't these set rules. So they were able to manipulate the numbers in order to get where they wanted to go. With regard to group pleading, the complaint is not alleged based solely on the position of the officers that corporate statements, that they, that scientrically imputed to them from these corporate statements. It is alleged that these individual defendants, based on either what they knew or what they were severely reckless in not knowing, engaged in these improper activities, particularly again with regard to McHenry. This is not group pleading. McHenry himself engaged in these practices after setting the tone. And then finally with regard to Defendant Kirk, although he was a CAO for just, admittedly, the first portion of the class period before Mr. Assar took over, he was, he was a CAO at the beginning, beginning of the restatement period, which was 2009. So he was there much longer, he set the tone, and then after he retired, resigned as CEO, he still remained the Chairman of the Board of Directors. And so even though his primary liability would end when he left his position as CEO, in terms of control liability, where he's still there, he's aware of the tone, he's aware of the No further questions? Thank you.